UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| MARCUS E. CRAWFORD, individually and on behalf of similarly situated individuals, | ) ) ) ) | |
| Plaintiffs, | ) ) | 3:14-cv-00018-RLY-MPB |
| vs. | ) ) | |
| PROFESSIONAL TRANSPORTATION, INC. and RONALD D. ROMAIN, individually and as president and secretary of PROFESSIONAL TRANSPORTATION, INC., | ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION TO DECERTIFY and DEFENDANTS' MOTION TO STRIKE**

Proposed Class Representative Marcus Crawford[1], the Plaintiff herein, seeks to recover "overtime compensation and minimum wages for work activity performed by over the road [OTR] drivers" employed by Defendant, Professional Transportation, Inc. ("PTI"). His Complaint seeks damages based upon seven different theories for alleged underpayment of minimum wages and overtime pay under the Fair Labor Standards Act, 29 U.S.C. § 216(b). His Complaint also alleges that as an OTR driver, he was misclassified as exempt under the FLSA and not treated as eligible for overtime at all. Finally, his Complaint alleges that he was not properly paid mileage for all miles driven.

---

[1] Mr. Crawford was substituted for former named plaintiff, Denessa V. Blair. (Filing No. 209).

1

On April 10, 2014, the court conditionally certified this matter as a collective action pursuant to the parties' stipulation. The conditional class is defined as all current and former employees of Professional Transportation, Inc. who worked as OTR drivers at any time from February 11, 2011 to present with outstanding claims for wages. (Filing No. 33, Order).

On July 18, 2016, Defendants, PTI and PTI President Ronald D. Romain, filed the present Motion to Decertify Collective Action. On November 11, 2016, Defendants moved to strike certain evidence submitted by Plaintiff in his Response. In addition, the parties orally argued their positions on March 16, 2017. The court, having considered the parties' oral argument and reviewed their submissions, the designated evidence, and the applicable law, now finds Defendants' Motion to Decertify should be **GRANTED** and Defendants' Motion to Strike should be **GRANTED in part and DENIED as MOOT in part**.

I.  **Facts**

   A.  **Background Regarding PTI**

PTI provides OTR and dedicated yard van crew transportation services to customers in the railroad industry across the United States, including CSX Transportation, Kansas City Southern, Norfolk Southern, Union Pacific, Amtrak, and more recently, BNSF Railway, Canadian Pacific Railroad, Utah Railway, and Portland and Western Railroad. (Filing No. 283-3, Declaration of Taraha Baum ("Baum Decl.") ¶¶ 5-7).

PTI's drivers work out of more than 300 branch offices located in forty different states. (*Id.* ¶ 11). Branch offices vary in size, from having as few as one driver to as many as 174 drivers. (*Id.* ¶ 13). Management of PTI's branch offices varies too. For example, 47 branches currently have a dedicated Branch Manager responsible for managing an entire branch. (*Id.* ¶ 19). Fifty-six branches currently share a Branch Manager, and 30 branches currently have an Assistant Branch Manager. (*Id.*).

Before July 1, 2011, PTI classified its OTR drivers as exempt from the FLSA's overtime pay requirements pursuant to the Motor Carrier Exemption. (*Id.* ¶ 28). Since July 1, 2011, PTI has treated OTR drivers as non-exempt. (*Id.* ¶ 29).

### B. PTI's Van Inspection Policy Before May 1, 2013

Before May 1, 2013, PTI's Driver's Manual directed drivers to inspect their assigned vehicle before each OTR trip. (Filing No. 283-4, Declaration of Steven Greulich ("Greulich Decl.") ¶¶ 8-9). Before June 2012, OTR drivers recorded trips, mileage, wait time,[2] and working time on handwritten trip vouchers. (Baum Decl. ¶ 31). Included on the voucher was a "Pre-Trip Checklist" of nine vehicle inspection items and a column for drivers to record their "Start Time," "Stop Time," and "Total Time" associated with the inspection. (*Id.*, Ex. D). The pre-May 2013 Driver's Manual

---

[2] PTI pays OTR drivers both mileage and an hourly rate for non-driving time such as wait time, subject to minimum wage adjustments. (Baum Decl. ¶¶ 22-23, 27). "Wait time" is the time the driver reports having to wait at the Origin after the "Need time" but before the crew is loaded and the driver departs from the origin. Wait time can also accrue during a trip if, for example, the driver takes the crew to food/rest stops. (*Id.* ¶ 68). "Need time" is the time the railroad expects the driver to arrive at the "origin" or pick-up point. (*Id.* ¶ 63). "Begin time" is the time a driver reports as their start time. (*Id.* ¶ 65). "End time" is the time a driver reports his trip to have ended after he drops off the crew at the assigned destination, refuels the van, and drops off the van at the designated hub. (*Id.* ¶ 67).

contained a list of instructions to be used by drivers to complete written trip vouchers—including a directive that the "Pre-Trip Checklist" was to be provided by the driver. (Greulich Decl. ¶¶ 8-9, Ex. B at 29-30, Ex. C at 31-32). According to PTI, if conducted and inspected correctly, the inspection should take a driver no more than two minutes. (Baum Decl. ¶ 31).

PTI drivers reported the information included on the trip voucher by telephone to PTI's dispatchers. (*Id.* ¶ 34). Dispatchers recorded drivers' trip information into a centralized database for the purpose of processing driver pay. (*Id.*). Drivers were not required to report to dispatch the "Start Time," "Stop Time," and "Total Time" for their inspections. (*Id.*).

In addition, before June 2012, drivers were also asked to complete a daily Van Inspection Checklist. (*Id.* ¶ 36, Ex. F). The Checklist asked drivers to review ten categories of inspection items and indicate whether those items passed or failed. (*Id.*). The Checklist also included the date of the inspection, branch, vehicle number, driver's name, and the starting and ending miles of the vehicle. (*Id.*). The Checklist did not ask drivers to record the stop, start, or total time associated with the inspection. (*Id.*). If conducted and performed correctly, the inspection and Checklist should be completed in less than five minutes. (*Id.* ¶ 37). PTI drivers were required to turn in this Checklist to PTI's Fleet Manager or Assistant Manager. (*See*, *e.g.*, Filing No. 296-31, Deposition of Marcus Crawford ("Crawford Dep.") at 60). Consequently, prior to May 2013, PTI did not track OTR driver time spent in pre-trip safety inspections. (Filing No. 296-30, Deposition of Tahara Baum ("Baum Dep.") at 91-92).

4

In June 2012, PTI began rolling out the Crew Mobile system, a touch screen computer system installed in each vehicle that allowed OTR drivers to report mileage, wait time, and working time to PTI in real time. (Baum Decl. ¶ 39). Crew Mobile allows drivers to record vehicle inspections instead of using written vouchers or the Inspection Checklist. (*Id.*). Phased-in installation of the Crew Mobile system at each branch occurred between March and December 2012. (*Id.* ¶ 40).

Plaintiff testified that the Crew Mobile system rarely worked for purposes of reporting a vehicle inspection because the screen frequently locked after a trip was accepted into the system. (Crawford Dep. at 136-39). Therefore, inspections were typically reported manually. (*Id.* at 139). Taraha Baum, Senior Director of Operations Accounting, testified that if a trip was closed manually (i.e., not on Crew Mobile), inspections times were not reported to the dispatcher. (Baum Dep. at 77) ("Q: Are inspection times recorded on the – are they reported to the dispatchers? A: No.").

### C.   PTI's Van Inspection Policy After May 1, 2013

In March 2013, the Work Rules Management Team recommended that PTI revise the Driver's Manual to require vehicle inspections to be completed *at the end* of each OTR trip, when the driver was refueling the vehicle (the "End-of-Trip Inspection Policy"). (Baum Decl. ¶ 42). The purpose of the revision was twofold: (1) to ensure that vehicle inspections were actually completed; and (2) to ensure that any time drivers spent performing the inspections would be recorded in the event inspection time was not deemed to be *de minimis* (i.e., 10 minutes or less) under federal wage and hour law. (*Id.*).

The following month, PTI created the Pay Practices Team to revise the Driver's Manual to reflect the new policy.  (*Id.* ¶ 43).  The Pay Practices Team published three documents: (1) "Notice to Drivers"; (2) "Revisions to Published Policies"; and (3) a revised Driver's Manual, all of which explained the End-of-Trip Inspection Policy and related procedures.  (*Id.* ¶¶ 43-44, Exs. H, I, and J at 10, 33).  The Pay Practices Team distributed these documents to PTI's General Managers, who held conference calls with their Branch Managers to explain the work rule changes at the end of April 2013.  (*Id.* ¶ 45).  In May 2013, the Pay Practices Team distributed these documents to branch management.  (*Id.* ¶ 46).  And in August and September 2013, the Pay Practices Team distributed paper copies of the revised Driver's Manual, which included the End-of-Trip Inspection Policy—to every OTR driver.  (*Id.* ¶ 47).  Each driver was expected to sign forms acknowledging their receipt of the same.  (*Id.*).

In addition, Tammi Hinkley, PTI's corporate trainer, conducted management training from October 2012 to May 1, 2013.  (Filing No. 283-7, Declaration of Tammi Hinkley ¶ 13).  During her training, she discovered that many branch managers were not properly training their OTR drivers to complete vehicle inspections pursuant to the Branch Manager Training Manual.  (*Id.*).  She therefore developed the Branch Manager Training Program to train newly hired general managers and branch managers.  (*Id.* ¶¶ 15-16).

Despite this training, the evidence reflects that not all branches were following this policy.  (*See*, *e.g.*, Filing No. 283-3, Email dated October 13, 2015).  Therefore, in 2015, PTI conducted a series of meetings between departmental leadership in Evansville and

regional and branch management in the field. (Baum Decl. ¶ 57). During a meeting on October 13, 2015, a branch manager from the Philadelphia branch indicated that his drivers were completing two inspections, one at the beginning of the trip and one at the end of the trip. (*Id.* ¶ 58). The following week, at the request of PTI President Romain, Baum conducted a teleconference with all branch managers present at the October 13 meeting to review PTI's End-of-Trip Inspection Policy. (*Id.* ¶ 59).

### D. The Present Action

This lawsuit was filed on February 11, 2014. (Filing No. 1, Complaint). Plaintiff's counsel was provided with the names of 19,996 potential Opt-In Plaintiffs. The Legal Notice, filed in conjunction with the Stipulation of Conditional Certification, contained this class definition:

> All current and former employees of Professional Transportation, Inc. who worked primarily (i.e., more than 20%) as over-the-road drivers at any time from February 11, 2011 to present with outstanding claims for wages.

(Filing No. 22-1, Legal Notice; *see also* Filing No. 22-2, Consent to Opt In ("I hereby give my consent to opt in and agree to become a party plaintiff in the above-captioned lawsuit brought under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, seeking the recovery of unpaid overtime wages and minimum wages.")). Approximately 3,447 of the 19,997 potential Opt-Ins responded.

PTI sought individualized discovery from each Opt-In Plaintiff, including their claims for additional pay and vehicle inspections. (*See* Filing No. 214, Defendants' Brief Addressing Individualized Discovery). Plaintiff opposed the motion, arguing that the information sought by PTI was uniquely within the possession of PTI, and, because

7

Plaintiff would rely on "representative evidence," any individualized discovery would be unduly burdensome and unnecessary. (*See* Filing Nos. 203, Case Management Plan at 5-6; 205, Plaintiff's Motion in Support of the Proposed Case Management Plan; 216, Response to Defendants' Brief Addressing Individualized Discovery; 224, Plaintiff's Response to Defendants' Objection). After hearing arguments from the parties, the Magistrate Judge concluded that the questionnaire to be sent to the Opt-Ins should ask: "Do you believe that you are entitled to additional pay for any work week while you were employed by PTI as an over the road driver?"[3] (Filing No. 220, Order on Plaintiff's Motion in Support of Proposed Case Management Plan). On appeal, the court upheld the Magistrate Judge's Order, finding it was not clearly erroneous. (Filing No. 232 Order Overruling Defendants' Objection).

All other facts necessary for a resolution of this motion will be addressed in the Discussion Section.

## II.  Motion to Strike

Before addressing the merits, the court must first address PTI's Motion to Strike the following: (1) 1,595 declarations of undeposed Opt-In Plaintiffs regarding their van inspection activities; (2) the declaration of Plaintiff's counsel, Terry Smith; (3) the declaration of undeposed non-party Alfonso Walker; and (4) the administrative decision on Plaintiff's application for unemployment benefits.

---

[3] The questionnaire included two other questions: (1) whether the Opt-In Plaintiff had filed for bankruptcy and (2) whether the Opt-In Plaintiff had copies of any documents that show the hours worked from February 11, 2011 to the present, the amount of compensation received for that time period, and the actual duties performed as an OTR driver. *Id.*

### A. The Declarations

After PTI filed its Motion to Decertify, Plaintiff submitted 1,594 declarations executed by undeposed Opt-Ins, dated July or September of 2016—all after the close of discovery. (Filing Nos. 296-10, 296-11, 296-12, 296-13, 296-15, 296-22, 296-44, 296-46). 1,390 declarations consist of the same two paragraphs: "(1) I am an opt-in plaintiff in the above-entitled matter" and "(2) I performed and recorded pre-trip inspections as directed by my manager." (Filing Nos. 296-10, 296-11, 296-12, 296-13, 296-22). An additional 202 declarations provide the duration of the inspection (ranging from 10 to 45 minutes). (Filing No. 296-15; Filing No. 326-1, Supplemental Declaration of Denise Simpson ("Simpson Supp. Decl.") ¶ 10). PTI argues Plaintiff is judicially estopped from using these declarations to establish the Opt-Ins performed pre-trip van inspections even after the change in policy.

Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000). Judicial estoppel applies not only to factual statements; it also applies to legal arguments made at all stages of a legal proceeding. *In re Cassidy*, 892 F.2d 637, 641-42 (7th Cir. 1990). To invoke judicial estoppel with respect to inconsistent statements, the court considers two factors: (1) whether the later position was clearly inconsistent with the earlier position; and (2) whether the party to be estopped convinced the court to adopt its position. *Levinson v. United States*, 969 F.2d 260, 264-65 (7th Cir. 1992).

Both factors are satisfied here. With respect to the first, Plaintiff argued to the court that individualized discovery should not be allowed because the information was within the possession of PTI and because individualized discovery would be unduly burdensome and unnecessary. Plaintiff now seeks to rely on over 1,550 declarations from Opt-Ins concerning van inspections. Second, the court adopted Plaintiff's position by limiting individualized discovery to only one substantive question, and precluding PTI from raising all questions relating to van inspections. Plaintiff is therefore estopped from relying on these declarations.

Even if the court were to consider these declarations, they fail to assist Plaintiff's case. The declarations do not state *when* the Opt-In Paintiffs were directed to record pre-trip inspections. Were these *before* the May 1, 2013 policy change or not? They do not provide the name of the manager who ordered the pre-trip inspection, do not state whether the inspections were performed on or off-the-clock, how often the inspections were performed, nor whether the driver was an OTR driver (as opposed to a dedicated yard van driver subject to a different policy). Therefore, all 1,594 declarations are stricken.

### B.     The Declaration of Terry Smith

Terry Smith is one of Plaintiff's attorneys. He analyzed the evidence regarding "the various number of trips; numbers of inspections; when such inspections were reported in relationship to other recorded events pertaining to individual trips; and information regarding the same as above except on an individual opt-in basis." (Filing No. 296-47, Declaration ¶ 3). Based on his interpretation of the data, he expresses his

opinion, draws inferences from the data, and fails to lay an appropriate foundation. For example, on page 2, he determined that 50 of 194 trips made by OTR driver Terry Grettler where no van inspection time was recorded "were second or third trips made," which "not only had to be in close temporal proximity to each other, but must have been made in the same vehicle as the previous trip." And on pages 10-14, Mr. Smith "undertook an evaluation of when the vehicle inspection time was reported in relationship to the closest event in the trip . . . . The purpose of this was to determine if members of the class were in fact reporting their inspection times at the end of the trip in accordance with PTI policy or whether they were reporting their vehicle inspection at the beginning of the trips." As argued by PTI, Mr. Smith is not qualified as an expert and was not disclosed as such. Furthermore, contrary to Mr. Smith's assertion, his declaration is not a proper summary of the data per Fed. R. Evid. 1006. To be admissible, summary evidence must be "a neutral compilation of data without opinion." *United States v. Dish Network LLC*, 75 F. Supp. 3d 916, 933 (C.D. Ill. 2014). And ethically, Mr. Smith cannot serve both as counsel and witness. *United States v.* Jones, 600 F.3d 847, 861-62 (7th Cir. 2010) (noting the advocate-witness rule "generally bars a lawyer from acting as both an advocate and a witness in the same proceeding"). For this and for the numerous reasons advanced by PTI, Mr. Smith's declaration is stricken.

    **C.    The Declaration of Alfonso Walker and Plaintiff's Application for Unemployment Benefits**

Alfonso Walker is a former Branch Manager for PTI, stationed at the Chicago East branch. (Filing No. 296-50, Declaration of Alfonso Walker ¶ 1). Walker worked with

Plaintiff, and promoted him from Night Manager to Assistant Branch Manager. (*Id.* ¶ 3). Plaintiff submitted Walker's declaration to address the topics of vehicle inspection, Plaintiff's character, and Plaintiff's termination. Plaintiff also submitted his application for unemployment benefits (Filing No. 296-7) to substantiate his claim that he was not terminated for fraudulent conduct. PTI objects for a multitude of reasons. Plaintiff responds the declaration and the application for unemployment benefits are offered to rebut PTI's attempt to remove him as class representative for, *inter alia*, allegedly lying on his employment application and engaging in fraudulent conduct.

The court need not address Plaintiff's fitness to be class representative, as there are other reasons why this action must be decertified. Accordingly, the motion to strike these documents is **DENIED as MOOT**.

### III. FLSA Collective Action

"Under Section 216(b) of the FLSA, employees may bring a collective action on behalf of themselves and other 'similarly situated' employees against employers who violate the Act's minimum wage and overtime provisions." *Smallwood v. Ill. Bell Tel. Co.*, 710 F. Supp. 2d 746, 750 (N.D. Ill. 2010) (quoting 29 U.S.C. § 216(b)). The FLSA does not define the term "similarly situated," *Russell v. Ill. Bell Tele. Co.*, 721 F. Supp. 2d 804, 811 (N.D. Ill. 2010), and the Seventh Circuit has not set forth criteria for determining whether employees are "similarly situated" or how collective actions should proceed. *Hundt v. Directsat USA, LLC*, 294 F.R.D. 101, 103 (N.D. Ill. 2013). Therefore, courts in this circuit typically use a two-step inquiry. *Hawkins v. Alorica, Inc.*, 287 F.R.D. 431, 438 (S.D. Ind. 2012).

12

The first stage, also known as the notice stage, requires a plaintiff "'to make a modest factual showing that [he] and the other employees to whom notice is to be sent were victims of a common policy or plan that violated the law.'" *Streeter-Dougan v. Kirkston Mortgage Lending, LLC*, No. 3:13-cv-166-RLY-WGH, 2013 WL 6174936, at *1 (S.D. Ind. Nov. 21, 2013) (quoting *Nogueda v. Granite Masters, Inc.*, No. 09-cv-374, 2010 WL 1521296, at *2 (N.D. Ind. Apr. 14, 2010)). The second stage occurs after the parties have engaged in discovery and the opt-in process is complete. *Hundt*, 294 F.R.D. at 104. In this stage, the court has "the opportunity to determine whether the class should be decertified or restricted because putative class members are not in fact similarly situated as required by the statute." *Streeter-Dougan*, 2013 WL 6174936, at *1 (citation omitted). Under this more stringent inquiry, the court generally considers three factors: (1) whether plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns. *Threatt v. CRF First Choice, Inc.*, No. 1:05-cv-117, 2006 WL 2054372, at *5 (N.D. Ind. July 21, 2006). The plaintiffs bear the burden of showing that they are similarly situated. *Hundt*, 294 F.R.D. at 104 (citing *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 345 (N.D. Ill. 2012)).

**IV.    Discussion**

PTI advances a number of arguments in favor of decertification which all center on whether Plaintiff and the OTR drivers who opted into this class have inherently

13

individualized claims which require decertification of this collective action. The court begins with the class definition.

### A. The Class Definition is Overbroad

The Complaint alleges FLSA violations under seven different theories. It also alleges Plaintiff was misclassified as exempt from overtime pay under the FLSA, and that he was not paid for all miles driven. Legal Notice and Consent to Opt In forms were mailed to potential Opt-In OTR drivers soon thereafter. At that time, the class was defined as, and continues to be defined as, those former and current OTR drivers employed from February 11, 2011 to the present with outstanding claims for wages. Thus, neither the Legal Notice nor Consent to Opt-In reference pre-trip inspection at all. After this case was conditionally certified as a collective action, however, Plaintiff narrowed his theory of liability "to two areas, (i) minimum wage/overtime compensation for OTR driving and (ii) required pre-trip van inspections." (Filing No. 254, Plaintiff's Response to Defendants' Motion to Compel Opt-In Plaintiffs to Respond to Discovery at 1 n.1). Thus, absent individual inquiry into the reasons why each Opt-In OTR driver decided to join this lawsuit, the court cannot ascertain whether the Opt-Ins purportedly have pre-trip inspection claims or claims based on some other theory. The class definition is, therefore, fatally overbroad. *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 380 (7th Cir. 2015) ("If, however, a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.").

### B. Class Periods

Second, the class period spans from February 11, 2011 to the present. During this period, PTI changed its policies and practices regarding the exempt status of its OTR drivers and its van inspection policy. These policy and procedural practices impact the putative class and thus require the court to consider three time periods: (1) February 11, 2011 to July 1, 2011; (2) February 11, 2011 to April 30, 2013; and (3) May 1, 2013 to present.

#### 1. February 11, 2011 to July 1, 2011

Prior to July 1, 2011, PTI classified its OTR drivers as exempt from the FLSA's overtime pay provision. Therefore, those Opt-In Plaintiffs who worked for PTI before July 1, 2011, potentially have a claim for unpaid overtime.

During oral argument, (and to PTI's great surprise), Plaintiff's counsel represented that the Plaintiff and Opt-In members do indeed have a claim for minimum wages and overtime. Plaintiff's counsel did not explain the nature of that claim nor cite the court to evidence from which it could conclude that Plaintiff or *any* Opt-In Plaintiff has a valid claim for minimum wages or overtime pay. Furthermore, Plaintiff explicitly states in his Response that he is *not* bringing a misclassification claim. (Filing No. 296, Plaintiff's Response to Defendants' Motion to Decertify at 47). Thus, at least at this juncture, a class for this time period may not be certified.

#### 2. Pre-Trip Inspection Class Periods

The policy and practice of performing pre-trip inspections raises a host of issues. First, the parties do not agree on the duration of a pre-trip inspection. PTI claims it

15

should take around 5 minutes. (Baum Decl. ¶ 37). The Opt-Ins claim it took longer to perform an inspection—from as little as 10 to as much as 45 minutes. (Simpson Supp. Decl. ¶ 10). Courts typically find an inspection lasting 10 minutes or less to be *de minimis* and not compensable under the FLSA. *See Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) (finding periods of 10 minutes or less *de minimis* even though otherwise compensable) (citing *Lindow*[4] *v. United States*, 738 F.2d 1057, 1064 (9th Cir. 1984)); *Troester v. Starbucks Corp.*, No. CV 12-7677, 2014 WL 1004098, at *3 (C.D. Cal. Mar. 7, 2014) ("[N]umerous courts have held that daily periods of approximately 10 minutes are de minimis."). In addition, an OTR driver's trip voucher had a "Start Time," "Stop Time," and "Total Time" for a pre-trip inspection, but in practice, OTR drivers did not complete that portion of the voucher. On the other hand, an OTR driver was required to turn in the Checklist at the end of his/her shift, but the Checklist did not ask the driver to record the start, stop or total time associated with the inspection. And Crew Mobile, rolled out in June 2012, rarely worked for purposes of recording vehicle inspections.

Second, there is evidence in the record which casts doubt on whether OTR drivers consistently performed pre-trip inspections before every shift. Danny Barr, Regional

---

[4] In *Lindow*, the Ninth Circuit set forth a four factor frame work when applying the *de minimis* exception in FLSA cases. *Id.* at 1062–64. The first factor is "the amount of daily time spent on the additional work." *Id.* at 1062. The second factor is "the practical administrative difficulty of recording the additional time." *Id.* at 1063. The third is "the aggregate amount of compensable time." *Id.* And the fourth is "the regularity of the additional work." *Id.*

Vice-President of Operations—Central Region for PTI, testified it was apparent to him and to other members of PTI management that drivers were not consistently complying with the pre-trip inspection policy. (Filing No. 283-6, Declaration of Danny Barr ¶ 11). For example, weekly and monthly inspections revealed issues with vehicles that were not noted on the driver's Checklist; other drivers observed the inspections were not being performed or, if they were, not performed properly; and a 2012 field safety audit concluded a significant percentage of OTR drivers were not completing the daily vehicle inspections. (*Id.*). In addition, PTI submitted evidence that 11 Opt-In Plaintiffs were disciplined for failing to perform vehicle inspections. (Gruelich Decl., Ex. F). Based on this evidence, the court finds the Opt-Ins pre-trip inspection claims raise inherently individualized issues which doom Plaintiff's quest for class certification.

Third, Plaintiff claims that, notwithstanding the May 1, 2011 effective date of the End-of-Trip Inspection Policy, PTI management continues to require OTR drivers to perform pre-trip inspections. But on this point, the evidence from the Opt-In Plaintiffs is conflicting. For example:

- Thomas Pruss testified that he saw the new policy, signed it, but did not read it. (Filing No. 283-20, Deposition of Thomas Pruss at 62).
- Terry Grettler testified he learned of the new policy in early 2016, but continued to perform pre-trip inspections because "you can't trust the people that had the van before you." (Filing No. 283-13, Deposition of Terry Grettler at 39).

- Yuwsuf Abdulghafoor testified he was verbally informed of the end-of-trip policy, but did both a pre- and post-trip inspection anyway. (Filing No. 283-12, Deposition of Yuwsuf Abdulghafoor at 65, 66, 68).

- Seth Kirshen testified he does not perform a pre-trip inspection every day because he had an assigned vehicle that he drove home. "Since [he] drove [the same van] every day, [he] knew what was going on with it." (Filing No. 283-15, Deposition of Seth Kirshen at 70).

Deposition testimony from branch management, cited by Plaintiff, is equally problematic.

- Branch Administrator Debra Clayton testified that she never told her drivers at the Chattahoochee branch to perform post-trip inspections. (Filing No. 296-41, Deposition of Debra Clayton at 89-90 ("I told them to do them pre-trip so that they were – like I said before, if there was an accident or an incident where a driver damaged the van and didn't report it, then they would be blamed for it. So I told them they had to do their pre-trip inspections to cover theirself [sic].")).

- Assistant Manager Jon Steepleton testified that he told his drivers at the Elkhart branch to perform vehicle inspections post-trip, "[b]ut for whatever reason, most of them do not." (Filing No. 296-35, Deposition of Jon Steepleton at 57).

- Fleet Manager Jared McNeley testified that the Denver branch tried to implement the new policy, but ultimately decided to require pre-trip inspections for safety reasons and a "walk-around" inspection of the vehicle at the end of the trip. (Filing No. 296-36, Deposition of Jared McNeley at 41-42, 52-54).

18

- Assistant Manager Elizabeth Hires testified that after the new policy was communicated to those at the Waycross branch, management decided to require pre-trip inspections anyway. (Filing No. 296-40, Deposition of Elizabeth Hires at 60-61, 91).
- And finally, Dave Brown from the Philadelphia branch indicated his drivers perform a pre-trip and post-trip inspection to ensure the vehicle is safe. (Filing No. 283-3, Email).

This evidence reinforces the fact that there is no common policy or practice alleged to violate the FLSA that underlies the claims of the collective class. Plaintiff and the Opt-Ins experienced widely disparate factual and employment settings. Furthermore, because the policy was effective May 1, 2011, and because some of the Opt-In Plaintiffs learned of the policy at differing times, an individualized inquiry into when each Opt-In learned about the End-of-Trip Inspection Policy, and, if applicable, why he or she chose to ignore the policy, would be required to determine both liability and damages. This type of individualized inquiry is not suitable for class certification. For this and the multitude of other arguments raised by PTI, the court finds it must decertify this collective action.

## V.      Conclusion

For the reasons set forth above, the court hereby **GRANTS** Defendants' Motion to Decertify (Filing No. 281) and **GRANTS in part** and **DENIES in part as MOOT** Defendants' Motion to Strike (Filing No. 304).


**SO ORDERED** this 22nd day of March 2017.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.